IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA,

MISSOULA DIVISION

| | | |
|---|---|---|
| SHEILA M. MURPHY, | ) | Cause No. CV-11-104-M-DWM |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER |
| vs. | ) | |
| | ) | |
| UNUM GROUP, | ) | |
| | ) | |
| Defendant. | ) | |

The parties to this Employee Retirement Income Security Act (ERISA) action have filed cross-motions for summary judgment. Plaintiff Sheila M. Murphy challenges the calculation and termination of her claim for long-term disability benefits by Unum Life Insurance Company of America ("Unum"). Unum counters that its interpretation of Plaintiff's policy was reasonable based on the information it had before it and that Plaintiff failed to prove her entitlement to

benefits. For the reasons discussed below, summary judgment is granted in favor of Unum.

## I. STATEMENT OF FACTS

Sheila Murphy ("Plaintiff") is the General Manager of Sheila Callahan and Friends, Inc., d/b/a KMSO Radio. Her husband, Max Murphy, ("Mr. Murphy") is the Chief Financial Officer, and they co-own the business. In 2001, KMSO Radio purchased a long-term disability insurance policy, Policy No. 557224 (the "Policy" or "Plan"), through Unum. (Stipulations of Fact and Law, doc. 11 at 2.) Plaintiff was a participant in the Plan, and paid premiums based on the representation that she earned $4500 a month.

The Plan delegates to Unum discretionary authority to make benefit determinations, including "determining eligibility for benefits and the amount of any benefits, resolving factual disputes, and interpreting and enforcing the provisions of the Plan." (AR 118.) It defines disability as follows:

> You are disabled when Unum determines that:
> - you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury, and
> - you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

(AR 97). The Plan requires a claimant to provide proof of both the medical and financial components of her claim, including "the appropriate documentation of

[her] monthly earnings," proof of disability earnings, and proof of "the extent of [her] disability, including restrictions and limitations preventing [her] from performing [her] regular occupation." (AR 80, 99.) It warns that failure to provide "the appropriate information" may result in Unum denying the claim or stopping payments on the claim. (AR 80.)

On May 14, 2009, Plaintiff fractured her ankle when she missed a step while descending stairs at her home. (AR 124–25.) She underwent surgery to repair the fracture on May 22, 2009, and on July 22, 2009, filed a claim for benefits under the Plan. (Doc. 11 at 2.)

Several problems developed during Unum's evaluation of the claim that delayed payment and ultimately resulted in the termination of payments. Unum was not satisfied with the documentation Plaintiff provided to substantiate her monthly earnings prior to being injured, but Plaintiff refused to provide the information Unum requested. Unum also determined that Plaintiff failed to prove that she had "a 20% or more loss . . . in indexed monthly earnings due to the same sickness or injury." (AR 97.) Despite repeated requests, she did not provide any documentation of her disability earnings. (*See* AR 599, 607, 754.) Additionally, Unum found Plaintiff's medical information did not support her claim that she

3

remained unable to perform the "material and substantial duties of [her] regular occupation." (AR 97, 625, 636.)

In February 2010, Unum released benefits through January 12, 2010, noting that a recalculation would be required if Plaintiff returned to work prior to that date. (AR 607.) It declined to make further payments until it received proof of Plaintiff's earnings and ongoing disability, and warned that her claim would be closed if the requested documentation was not received. (*Id.*) Plaintiff filed additional medical proof, but no further proof of her monthly or disability earnings. Unum thus closed the claim on May 13, 2010. (AR 771–72.) Unum affirmed its decision on appeal after considering additional medical records. (AR 1114–18).

## II. ANALYSIS

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may not rely on mere assertions or denials, but must, by "citing to particular parts of materials in the record," establish that there is or is not a genuine issue for trial. Fed. R. Civ. P. 56(c).

An ERISA plan participant may bring an action in federal district court "to recover benefits due to him under the terms of his plan, to enforce his rights under

4

the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). A "denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The parties here agree that the Plan grants Unum this discretion (Stipulations of Fact and Law, doc. 11 at 1; AR 118), and they do not argue that a heightened standard of review is required under *Metropolitan Life Insurance Co. v. Glenn*, 544 U.S. 105 (2008) or *Harlick v. Blue Shield of California*, ___ F.3d ___, 2012 WL 1970881, *4–5 (9th Cir. 2012). Though Unum apparently makes coverage decisions and pays benefits, there is no evidence that it gave inconsistent reasons for its decision, failed to provide a full review of any material portions of the claim, or failed to follow proper procedures in denying the claim. *Harlick*, 2012 WL 1970881, *5 (citations omitted). Nor is there evidence of a "history of biased claim administration" or a lack of a "neutral, independent review process." *Id.* (citations omitted). Thus, a deferential standard of review is appropriate. *Id.*; *Conkright v. Frommert*, ___ U.S. ___, 130 S. Ct. 1640, 1646 (2010).

"A plan administrator abuses its discretion if it renders a decision without any explanation, construes provisions of the plan in a way that conflicts with the plain language of the plan, or fails to develop facts necessary to its determination." *Anderson v. Suburban Teamsters of N. Ill. Pension Fund Bd. of Trustees*, 588 F.3d 641, 649 (9th Cir. 2009) (citing *Schikore v. BankAmerica Supp. Ret. Plan,* 269 F.3d 956, 960 (9th Cir. 2001)). A decision is not arbitrary or capricious if "it is based upon a reasonable interpretation of the plan's terms and if it was made in good faith." *Sznewajs v. U.S. Bankcorp Am. and Restated Supp. Benefits Plan*, 572 F.3d 727, 736 (9th Cir. 2009) (quoting *McDaniel v. Chevron Corp.,* 203 F.3d 1099, 1113 (9th Cir. 2000)). The Court bases its review of the insurer's decision on the "administrative record," the evidence that was before the insurer when it denied the claim. *See Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 632 n. 4 (9th Cir. 2009) (citation omitted).

## A. Benefits Calculation and Proof of Plaintiff's Monthly Earnings

Unum's calculation of Plaintiff's benefits entitlement complied with the Plan and was reasonable based on the information in the record. Under the Plan[1], a claimant's pre-disability "monthly earnings" are used to determine whether she

---

[1] The terms of the Plan govern Plaintiff's benefit entitlement. 29 U.S.C. § 1132(a)(1)(B). Thus, it is irrelevant how Unum calculated Plaintiff's premiums. However, according to Unum, Plaintiff may seek reimbursement if the premium was overpaid based on inaccurate income representations. (Doc. 19 at 7–8.)

is disabled (AR 99) and the payment amount to which she is entitled (AR 97–98). In relevant part, the Plan provides:

> [For owners,] "[m]onthly earnings" means your average monthly income from your Employer just prior to your date of disability and is computed based on the sum of your Schedule K-1 and W-2 income averaged over...the 3 most recent tax years (36 months).
>
> ....
>
> Schedule K-1 income is derived from the line that refers to "ordinary income (loss) from trade or business activities" received from your Employer.
>
> W-2 income is derived from the income box on your W-2 form that reflects "wages, tips and other compensation" received from your Employer. It is your total income before taxes. It is prior to any deductions made for pre-tax contributions to a qualified deferred compensation plan.

(AR 97.) The Plan obligates the claimant to provide Unum "appropriate information" to substantiate these earnings. (AR 80.)

Plaintiff refused to provide verifiable income information, despite repeated requests by Unum for copies of Plaintiff's actual personal and business tax filings. (E.g. AR 130, 332, 903–04, 943–44.) Instead, Plaintiff provided two conflicting sets of Schedule K-1 forms (AR 271–76, 542, 546, 549), neither of which appeared to be the forms that had been filed with the IRS (AR 320, 335). Using Schedule K-1 forms that Unum received from the Montana Insurance Commissioner and Plaintiff's W-2 forms, Unum applied the monthly earnings

7

calculation described in the Plan. (AR 553.) It arrived at a monthly earnings average of $1,540.71 and a monthly benefit of $924.43. (AR 1114.)

Plaintiff insists that the "amended" Schedule K-1 forms that Mr. Murphy sent to Unum in September 2009 should have been used instead. Mr. Murphy explained that he had not separated KMSO Radio's Section 179 deductions from the ordinary business income on the other Schedule K-1 forms. (AR 573, 855–57.) Thus, the Schedule K-1 income amounts used by Unum reflect Section 179 deductions for 2006 and 2008 (doc. 13 at 8).

Unum does not dispute Plaintiff's claim that Schedule K-1 income should reflect ordinary business income prior to Section 179 depreciation. (AR 1130.) However, Plaintiff refused to provide any documentation to substantiate the claimed Section 179 deductions. (AR 1130–31, 1139.) Accordingly, Unum upheld its calculation as the most reasonable based on the evidence in the record.

The Plan obligates the claimant to show "the appropriate documentation of [her] monthly earnings" and notes that she may be "required . . . to provide non-medical information as part of [her] proof of claim." (AR 80.) The Plan does not define "appropriate documentation" but grants Unum the discretionary authority to construe the Plan's terms. (AR 118.) It was reasonable for Unum to demand objective and verifiable earnings information. It did so repeatedly, but no

8

documentation substantiating Plaintiff's arguments was forthcoming. Only Mr. Murphy's assertions support using the "amended" K-1 forms over the K-1 forms that Mr. Murphy provided to the Commissioner. It was not arbitrary or capricious to require additional proof, particularly given the discrepancies between Mr. Murphy's original estimate of Plaintiff's monthly earnings (AR 130), his subsequent estimate based on the "amended" K-1 forms (AR 269–70), and the calculation based on the K-1 forms provided to the Commissioner (AR 1114). Accordingly, the record shows that Unum did not abuse its discretion in interpreting the Plan, resolving the factual dispute, or calculating Plaintiff's "monthly earnings" based on the information it had before it.

## B.  Proof of continuing disability

Unum did not abuse its discretion in terminating Plaintiff's benefits. Plaintiff failed to provide any proof of her disability earnings, making it impossible for Unum to determine if she remained disabled or the amount she was entitled to receive. Additionally, Unum reasonably defined the material and substantial components of her occupation as it is generally performed and determined that the medical evidence was insufficient to support a finding of continuing disability.

### 1.  Disability earnings

Plaintiff failed to provide evidence to justify further payments under the Plan. In order to calculate the benefit to which she continued to be entitled, Unum needed to know how much she was earning after she returned to work. The Plan defines "disability earnings" as "the earnings which you receive while you are disabled and working, plus the earnings you could receive if you were working to maximum capacity." (AR 111.) The Plan further provides:

> During the first 24 months of disability payments, if your monthly disability earnings exceed 80% of your indexed monthly earnings, Unum will stop sending you payments and your claims will end.
>
> . . . .
>
> Unum may require you to send proof of your monthly disability earnings at least quarterly. We will adjust your payment based on your quarterly disability earnings.
>
> As part of your proof of disability earnings, we can require that you send us appropriate financial records which we believe are necessary to substantiate your income.

(AR 99.)

Unum repeatedly requested this information. (AR 685, 878, 903, 943–44, 1038). But Plaintiff failed to provide any payroll information or her 2009 or 2010 tax information. Accordingly, her claim was closed, and that decision was affirmed on appeal. (AR 1131–32.)

Plaintiff claims that continuing complications from her injury forced her to bring a paid employee to public events to help set up or carry equipment and to pay an employee to cover times that she otherwise would have performed on air. (Doc. 18 at 7, AR 876–83.) This may have cost KMSO Radio additional money, possibly reducing Plaintiff's own earnings as the 51% shareholder. However, there is no documentation in the record to substantiate that speculation or to show that Plaintiff's disability earnings did not exceed 80% of her indexed monthly earnings. Accordingly, Unum's denial of her claim for continuing benefits was reasonable based solely on her refusal to provide proof of her disability earnings.

**2. Regular occupation**

Unum reasonably determined Plaintiff has the capacity to perform her job as it "is normally performed in the national economy, instead of how the work tasks are performed by a specific employer or at a specific location." (AR 114.) The Department of Labor's Dictionary of Occupational Titles defines the varying levels of exertion required by jobs as they are generally performed in the national economy. Thus, it was reasonable for Unum to turn to the Dictionary of Titles to determine how a position is "normally performed in the national economy."

The identification of Plaintiff's occupation was also reasonable. Both of the vocational consultants who reviewed Plaintiff's file classified her job duties as

being most consistent with those performed by a Station Manager. (AR 514,
1115–15.) That occupation largely fits Plaintiff's position as she described it
originally. As "General Manager" of a radio station (AR 158, 296), Plaintiff
represented she managed staff, planned and organized events, approved sales
contracts, managed service and sales accounts as well as media partnerships, and
visited clients' businesses. (AR 125, 296.) She also asserted that she had made at
least 120 public appearances the previous year and that she "sometimes would do
on-air work" and provide "voice talent." (AR 158, 296.) However, she did not
represent that on-air work was a key part of her position. "Voice talent" was listed
among several other duties under the heading "manage local clients and
partnerships"; in total, these duties consumed 10 hours per week. (AR 296.) She
also reported to her ENT that she did "intermittent, remote reports for Mountain
Broadcasting." (AR 803.) It was only later that she began to describe herself as
an "on-air personality."

    A Station Manager directs and coordinates the activities of a radio or
television station. (AR 512.) Primary duties include supervising personnel,
working with marketing personnel or directly promoting sales, discussing station
policy and procedures, and involvement with customer contact, general marketing
and sales promotion, and community service. (AR 512, 1165.) A Station

Manager's job requires "a frequent level of talking and hearing—(from 1/3rd to 2/3rds of the work day)," typically during interactions with staff and in the "context of sales calls, community service interactions, and ongoing customer relations calls and/or visits." (AR 1116.) However, the second vocational analyst concluded that Plaintiff's on-air and public speaking duties are not material and substantial components of the position as it is generally performed:

> Based on the size and scope of the radio, television, or cable station, the Station Manager position may or may not have an on-air presence or participate in the actual production of on-air materials. As such, this component of a claimant's work would not be considered a material and substantial component of the overall occupation. Nor would direct event personality broadcasts or event "emcee" appearances be considered a material and substantial duty of the overall Station Manager occupation.
>
> While duly noting this claimant's Job Description references to on-air production work and to external event appearance/emcee responsibilities, we would consider these activities to be specific requirements of the claimant's position with this policyholder and not necessarily representative of the manner in which the overall Station Manager occupation is performed.

(*Id.*) In accordance with the Policy, the analyst relied on how the position is generally performed, "instead of how the work tasks are performed by a specific employer or at a specific location."

Unum did not abuse its discretion in assessing her limitations based on the Station Manager description in the Dictionary of Titles. Unum reasonably

identified the occupation that most closely equates with Plaintiff's position as she described it. Accordingly, Plaintiff's on-air work and public appearances are not "material and substantial" components of her occupation as it is generally performed.

### 3. Medical evidence

The medical evidence also supports Unum's determination that Plaintiff did not have a continuing disability.

It was reasonable to conclude that the medical records concerning Plaintiff's ankle injury and neuroma do not support her claim of continuing disability. (AR 1109.) Unum's Designated Medical Officer, Dr. Matheny, considered Plaintiff's medical history, including references to a need for a second surgery. (AR 1088–90.) Plaintiff fractured her ankle in May 2009. (AR 1088.) It apparently healed well, if slowly. (AR 1090.) She saw her attending orthopedic surgeon, Dr. Heid, on October 15, 2009, and did not return for another visit until April 2010. (*Id.*) A neuroma had developed between two of her toes. (AR 1089–90.) Though Dr. Heid performed a steroid injection, she noted that Plaintiff was able to walk two miles, had been working out, had a normal gait, and that the ankle had healed well and was well-aligned. (AR 1067.) Plaintiff saw Dr. Heid again in May 2010. Dr. Heid mentioned that Plaintiff wanted to "consider excision of [the] neuroma in

14

the fall." (AR 932.) However, no follow-up medical reports were filed. (AR 1090.) In November 2010, Plaintiff again informed Unum that she planned to have the neuroma excised (AR 882), but no evidence suggests she ever scheduled the surgery or that she required ongoing use of pain medication. (AR 1090.) Based on the evidence in the record, Dr. Mathena and Unum reasonably concluded that "the clinical findings, functional information, and low ongoing treatment intensity related to the right ankle fracture, mild post traumatic ankle arthritis, and right foot neuroma were not consistent with impairment that would preclude work" as a Station Manager. (*Id.*)

Plaintiff also claims she remains disabled because her ability to use her voice "to perform on-air job duties" and act "as the master-of-ceremony for many local community functions" is limited. (Doc. 13 at 11–12.) Plaintiff does not claim that she is unable to engage in the occupation's "frequent level of talking and hearing—(from 1/3rd to 2/3rds of the work day)" during interactions with staff and in the "context of sales calls, community service interactions, and ongoing customer relations calls and/or visits." (AR 1116.) As discussed above, Unum reasonably determined that on-air performances and community appearances are not material and substantial components of Plaintiff's position as

15

it is generally performed in the national economy. Accordingly, under the Policy, limitations in performing these duties do not constitute continuing disability.

Though Plaintiff does not challenge Unum's implicit finding that she is able to engage in a frequent level of talking, a brief review of the record suggests that the finding was reasonable. The record does not reflect any vocal problems until January 2010, when Plaintiff returned to work. At that time, she reported to her family practice practitioner that she had suffered laryngitis and was losing her voice about a minute into on-air announcements. (AR 694.) In April 2010, she returned to the practitioner, complaining of a persistent cough. (AR 702.) Bronchitis and asthma were identified as the causes. (AR 702–03.) Defendant visited an ENT in April 2010 and May 2010. The ENT opined that her "intermittent hoarseness [was] related to professional voice use." (AR 801.) Plaintiff, however, speculated that a difficult intubation during her May 2009 ankle surgery was the cause. (AR 803.) The ENT performed a videostroboscopy, but did not notice any scarring, lesions, nodules, or polyps. (AR 802–03.) Rather, he diagnosed vocal strain and noted that in their conversations, Plaintiff had a "normal, fluent voice without significant friction, voice breaks, or breathiness." (AR 801, 803.) Similarly, the Unum representative who conducted a personal

16

field visit in November 2010 opined that her voice "sounded unremarkable." (AR 879.)

The ENT referred Plaintiff to a speech therapist and deferred to the speech therapist's opinions on her limitations. (AR 801, 1099.) Plaintiff saw the speech therapist regularly between May 26, 2010, and July 20, 2010, then does not appear to have pursued further care. (AR 1134.) The speech therapist prescribed breathing and relaxation exercises. (AR 801, 829–36.) In March 2011, she was contacted by Unum for an opinion on Plaintiff's vocal limitations. Though she had not seen Plaintiff for over seven months, she reported that Plaintiff has "limitations in her ability to sustain vocal projection." (AR 1109.) She noted that Plaintiff was unable to complete more than two 20-second radio spots, but did not opine that Plaintiff was unable to engage in frequent casual conversation. (*Id.*)

Though Plaintiff experienced some hoarseness and voice loss between January 2010 and July 2010, the record supports Unum's conclusion that she was not substantially limited by these problems. Her voice at each appointment sounded unremarkable and the videostroboscopy revealed no significant physical impairments. Plaintiff's complaints were typically limited to on-air or public speaking experiences, which are not material or substantial components of the Station Manager position. Accordingly, Unum did not abuse its discretion in

17

terminating benefits despite her voice complications and her speech therapist's opinion that she is limited in her ability to project her voice as is required on-air.

## IV. Conclusion

Summary judgment is thus granted in favor of Unum. The Plan provided Unum discretionary authority to interpret the terms of the Plan, resolve factual disputes, and determine a claimant's eligibility for and the amount of benefits. Unum acted reasonably and in accordance with the Plan in requesting information to substantiate Plaintiff's claimed monthly earnings, disability earnings, and continuing limitations. Plaintiff, however, failed to provide verifiable evidence of her monthly earnings or disability earnings, and provided inadequate medical evidence to support her claimed limitations. This constituted a sufficient, independent basis for terminating benefits and closing Plaintiff's claim.

Unum's benefits calculation also comported with the Plan, though the parties dispute which piece of conflicting evidence should have been used in the calculation. It was Plaintiff's obligation to provide the information requested by Unum that would have clarified this factual dispute, but Plaintiff refused. Unum reasonably used its discretion in resolving this dispute. It also followed the terms of the Plan in analyzing Plaintiff's limitations based on the definition of the Station Manager occupation as described in the Dictionary of Titles. It reasonably

construed the evidence in the record to determine that Plaintiff was no longer limited in performing the material and substantial components of the position as it is generally performed in the national economy. The rationale and factual basis for Unum's conclusion is adequately described in the Appeals Decision, and the record supports the conclusions therein.

Accordingly, IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment (doc. 12) is DENIED and Unum's Cross-Motion for Summary judgment (doc. 14) is GRANTED.

The Clerk is directed to enter judgment in favor of Defendant and against Plaintiff in accordance with this Order.

The Clerk is directed to notify the parties of the entry of Final Judgment in this case.

Dated this 20th day of June 2012.

_____
DONALD W. MOLLOY, DISTRICT JUDGE
UNITED STATES DISTRICT COURT